# Supreme Court of Texas

No. 21-0307

City of League City, Texas,

*Petitioner*,

v.

Jimmy Changas, Inc.,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

JUSTICE BLACKLOCK, joined by JUSTICE BLAND as to Part III, dissenting.

I agree with much of Justice Young's thoughtful concurrence. The "*Wasson* factors" employed by the Court to distinguish between the governmental and proprietary functions of a municipality have proven unsuited for their task. In addition, we should abandon the fiction that the *Tort* Claims Act's rambling list of governmental functions tells us anything about how to determine whether common law immunity applies to a *contract* claim. And it may very well be, as Justice Young suggests, that when a government accepts performance under a commercial contract and then refuses to pay, the government has

committed a compensable taking. I cannot join my colleague's concurrence, however, because I conclude that running a Chapter 380 tax-incentive grant program is a governmental rather than a proprietary function.

The courts have thus far demonstrated ourselves incapable of devising coherent standards in this area. Given the judiciary's difficulty, the people of Texas wisely empowered their Legislature to distinguish for all purposes between "governmental" and "proprietary" functions and thus to determine when municipalities may be sued for breach of contract. TEX. CONST. art. XI, § 13. Perhaps the Legislature will exercise this authority and thereby bring welcome clarity to the law.

## I.

Texas governments execute thousands of contracts every year with thousands of parties who rely upon, or at least hope for, the government to perform as promised. Determining which of these contracting parties will have a remedy against the public treasury in court and which will not seems to me a legislative undertaking. It requires balancing the value we place on holding our government to its promises against important competing values, such as (1) preserving the taxpayers' money and (2) ensuring that our government is ultimately controlled by democratic processes rather than by contractual obligations.

The second point may require elaboration. Contracts like the one at issue here purport to bind the government years into the future. Under such an agreement, the official who controlled the government when the contract was executed has promised that in the future the

government will do something, even though by that time the government may be controlled by new officials. But what happens if public outcry in response to a contract's execution causes the government to change course? What happens if the people elect a new government that disclaims the policy choices reflected in the contract? Must the new government nevertheless perform a deal it abhors? Are the people's representatives and the people's tax dollars tied to the mast of whatever deals have previously been executed in their name? How do we balance the obligation of contracts against the responsiveness of government to democratic influence? The Legislature is better suited than the Judiciary to answer these questions.

Government-sponsored "economic development" programs are no stranger to political controversy. People disagree in good faith about whether such programs are desirable. If the Court is right that the economic development agreement at issue here is a proprietary contract that may be enforced in court against League City, then the execution of the contract had the effect of limiting the options available to the people of League City for their future self-governance. In other words, if this agreement is enforceable in court like any other commercial contract, then its execution divested the people of League City of the power to end corporate welfare in their town, at least for the duration of the contract. If judicially enforceable, this agreement bound the city to future actions—actions laden with discretionary policy judgments—regardless of whether the city officials required to take those future actions continue to believe they promote the welfare of the people of League City.

Perhaps the courts ought to be empowered to issue judgments that bind municipal governments in this way. Perhaps not. The Legislature is better suited than the courts to answer such questions, and our Constitution empowers it to do so.

## II.

I find the *Wasson* factors of little use, largely for the reasons expressed by Justice Young. If we are to regain a coherent theory of the difference between the governmental and proprietary functions of a municipality, it ought to be more firmly grounded in the concepts conveyed by the words "governmental" and "proprietary," as was much of our pre-*Wasson* case law. The distinction between these two concepts will not have sharp contours in every case, but in general the distinction is not so difficult to perceive that sensible judges must labor under an artificial list of "factors" in order to see it. Municipal corporations do some things in their capacity as the government, and they do other things in the non-governmental capacity of a property owner or a proprietor of a corporate entity.[1] This is a natural, intuitive distinction, which should not be terribly difficult to grasp in most cases. The

---

[1] *Compare City of Port Arthur v. Wallace*, 171 S.W.2d 480, 481 (Tex. 1943) (fire protection is a governmental function), *Ellis v. City of West University Place*, 175 S.W.2d 396, 397–98 (Tex. 1943) (zoning is a governmental function), *White v. City of San Antonio*, 60 S.W. 426, 427 (Tex. 1901) (public health is a governmental function), *and Whitfield v. City of Paris*, 19 S.W. 566, 567 (Tex. 1892) (police protection is a governmental function), *with Gates v. City of Dallas*, 704 S.W.2d 737, 739 (Tex. 1986) (administering an insurance fund for employees is a proprietary function), *Lebohm v. City of Galveston*, 275 S.W.2d 951, 955 (Tex. 1955) (maintaining streets owned by the city is a proprietary function), *City of Houston v. Shilling*, 240 S.W.2d 1010, 1013 (Tex. 1951) (repairing a garbage truck is a proprietary function), *and Ostrom v. City of San Antonio*, 62 S.W. 909, 910 (Tex. 1901) (cleaning streets owned by the city is a proprietary function).

distinction is obscured rather than illuminated by mechanical application of judicial factors divorced from the underlying inquiry.

I do not pretend that this is always easy, but it was not always so hard. In 1884, we said that a municipality's governmental functions are "the responsibilities of towns and cities for acts done in their public capacity, in the discharge of duties imposed upon them by the legislature for the public benefit." *City of Galveston v. Posnainsky*, 62 Tex. 118, 130–31 (1884). On the other hand, proprietary functions are "acts done in what may be called [a city's] private character, in the management of property or rights voluntarily held by them for their own immediate profit or advantage as a corporation, although inuring, of course, ultimately to the benefit of the public." *Id.* at 131. These definitions aptly convey a useful sense of the distinction between a municipality's "public capacity" and its "private character." *Id.*

This conceptual distinction was not created by the Court's decisions. It arises from the nature of modern government, and it exists whether this Court enunciates it or not. Our precedent *notices* the distinction and gives it legal consequence. But our precedent did not create the distinction, and if our precedent causes us to lose sight of it, we should abandon the precedent, not the distinction.

The *Wasson* factors are only useful if they make it easier to perceive and apply the conceptual distinction these 140-year-old definitions point us towards—the distinction between the "public capacity" and the "private character" of a municipal corporation. In other words, the *Wasson* factors ought to be merely a tool in service of the ultimate inquiry. When the factors themselves become the inquiry—

5

as seems to have happened—the underlying concepts recede into the mist, and we lose sight of what we are really asking and why we are asking it.

In any given case, perceiving the line between governmental and proprietary functions may require good judgment and practical knowledge of how the world works, particularly the world of government. These are qualities we hope our judges possess. If judges lack these qualities, then requiring them to apply multi-factor tests divorced from a firm sense of the inquiry's conceptual foundations will not make the outcomes more sensible or more predictable. The search for scientific efficiency imagined by multi-factor balancing tests rarely delivers on its promises, as this case demonstrates. Instead, our propagation of these malleable judicial "tests" incorrectly suggests to judges and lawyers that "factors" announced by this Court are themselves the common law, rather than tools to be employed in service of better understanding the common law. This approach encourages all involved to ignore the moral and political foundations of the common law—or worse yet, to pretend those foundations do not exist and to think of the common law as nothing more than a list of "factors" announced by the Court a few years ago.

No matter the judicial methodology employed, judges will not always agree, as is the case today. But when we attempt to reduce intuitive conceptual categories with a deep common law history into "factors" to be mechanically applied in all cases, we strip away what should be our touchstone—the overall sense of the conceptual distinction from which the "factors" were derived. Judging often requires judgment,

unsurprisingly. It is rarely a science. A common law judge's responsibility to grasp and apply conceptual distinctions using good judgment and practical knowledge can rarely be reduced to the scientific application of multi-part balancing tests.

### III.

With these considerations noted, I conclude that the Chapter 380 tax-incentive program at issue here is a governmental function of the city. This is a case about the government's operation of a statutorily authorized grant program that awards tax incentives for economic development. The agreement between League City and Jimmy Changas has no "private character." It is not the kind of arms-length commercial exchange in which private parties might engage for their mutual benefit. Instead, it implements a tax-rebate grant program authorized by Article XI, Section 13 of the Texas Constitution and Chapter 380 of the Local Government Code and operated for the diffuse benefit of the public.

Only a government could or would run a grant program designed to generate diffuse public benefit by offering tax breaks to private entities. Taxation "is undeniably a governmental function." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). Indeed, "[t]he collection of taxes is undoubtedly one of the highest and most characteristic of the governmental functions." *Black v. Baker*, 111 S.W.2d 706, 708 (Tex. [Comm'n Op.] 1938). So the city's collection of taxes from Jimmy Changas to benefit the public is "undoubtedly" governmental, but the city's rebating of the same taxes to benefit the public is not. I do not follow.

7

Jimmy Changas' role in all this is as a participant in a government-benefits program operated in the city's distinctly "public capacity" pursuant to a statute—not as a participant in a bargained-for exchange of a "private character." Put another way, Jimmy Changas is a government grant recipient, not a government contractor—a beneficiary of government largesse, not a counterparty in a commercial exchange.

Jimmy Changas would object to this characterization and point out that it acted in reliance on the city's promises, to its potential financial detriment. But the government often requires many things of the recipients of its largesse, and people frequently act in reliance on the government's promise that it will extend benefits to those who dance to its tune. We do not typically treat such interchanges as enforceable by the common law of contracts. Instead, the remedies available to a disgruntled participant in a government-benefits program are those provided by the laws governing the program, not those available under contract law.

This Chapter 380 agreement is just one instance of the implementation of a quintessentially governmental program operated for a diffuse public benefit. In running such a program, League City is acting in its capacity as the government, using authority delegated to it by the Constitution and statutes of our state. League City is not acting in its capacity as a corporation or a property owner, and the nature of this tax-rebate agreement bears little resemblance to any contract that might be found in the private sector.

The Legislature could of course provide administrative or judicial remedies to participants in the local programs Chapter 380 authorizes, but it has not done so. Instead, the Legislature has provided Chapter 271, which authorizes breach-of-contract suits against municipalities only if the contract is "for providing goods or services to the" municipality. TEX. LOC. GOV'T CODE § 271.151(2). The recipient of a Chapter 380 grant does not provide "goods or services" to the municipality in the sense contemplated by Chapter 271. The city itself gets no direct benefit—no goods or services—out of the deal. It hopes for a diffuse benefit to the local economy, but there is no sense in which this agreement is an exchange of the city's money for an equivalent amount of goods or services owed to the city by Jimmy Changas.

Viewed alongside Chapter 271, the Court's decision today produces an awfully strange result. Private companies that enter into conventional commercial contracts to provide goods and services in furtherance of a city's governmental functions—for example, a company that sells computers to the police department—must abide by the procedural restrictions and liability limits of Chapter 271 if they decide to sue the city. Yet companies that receive economic development grant awards rebating their taxes under the authority of Chapter 380 have no need to consult Chapter 271 at all. They have a direct line to the courts, unmediated by the Legislature. The corporate welfare recipient now has more access to the courts than the government contractor. That this is where we have ended up speaks for itself about the pitiable state of the law in this area.

I respectfully dissent.

_____
James D. Blacklock
Justice

**OPINION FILED:** June 9, 2023